## Bishop, et al. v. Wolford.

(Decided March 4, 1927.)

### Appeal from Pike Circuit Court.

1. Tenancy in Common—Under Contract by which Rival Claimants to Land Agreed on Division and Perfecting of Title, One of Them Purchasing Outstanding Title Held Entitled to Contribution.— Where rival claimants to property entered into contract for division of property and for perfecting title as against outstanding

claims, one of contracting parties held entitled to contribution from other for amounts paid to executors of third party for purchase of outstanding title in litigation at time of contract.

2.   Tenancy in Common—Joint Owner, Compelled to Make Payment to Acquire Outstanding Title for Common Benefit, May Enforce Contribution from Other Joint Owners.—Where one joint owner, at his own expense, discharges lien on joint property, or is compelled to pay out money to acquire outstanding title for common benefit, he may enforce contribution in equity from other joint owners in proportion to their interests.

3.   Tenancy in Common—Under Contract of Joint Owners to do All Possible to Perfect Title, One Who Pays for Outstanding Claim for Benefit of All is Entitled to Contribution.—Where joint owners enter into contract in recognition of fact of outstanding conflicting titles, and agree to do everything possible to perfect title and acquire outstanding claims, one who in good faith acquires claim at his own expense for benefit of all is entitled to contribution from other according to proportion of interest.

4.   Tenancy in Common—Contract by which Rival Claimants Agreed to Divide Land and do All Possible to Perfect Title Constituted Merger of Interests.—Rival claimants to land, who entered into agreement for division thereof, and further agreed to do all possible to perfect title, and to stand together in litigation pending in regard to title, merged interests, each acquiring interest in whole, regardless of prior conflicting claims.

5.   Tenancy in Common—Claimant, Required to Contribute to Purchase of Outstanding Title, Could Set Off Value of His Surface Rights, Given in Part Consideration for Outstanding Title.—Where rival claimants entered into contract to divide land and do what they could to perfect title to mineral lands, purchase of outstanding title by one party, for which he had right of contribution, was subject to other party's counterclaim for his share of surface land which had been conveyed as part payment for outstanding title.

STRATTON & STEPHENSON for appellants.

MOORE & CHILDERS for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Reversing.

Prior to September, 1911, the title to the lands here indirectly involved was in a state of hopeless confusion. Several suits were pending in the Pike circuit court involving the title, in whole or part, both to the surface and the mineral rights. Many years before that Peter Cline had been the owner of two patents, each calling for 400 acres and adjoining each other. One was known as the "old patent lands" and had been formerly owned by Peter Cline's father, and the other known as the "new

patent lands," and was a patent issued directly to Peter Cline in 1866. Peter Cline conveyed the older patent to Dills, and Dills to Elijah Mounts. Elijah Mounts divided that land between his three sons, one of whom was Asbury Mounts. Asbury Mounts also acquired a tax title to the new patent lands.

In 1871 the sheriff levied an execution against Peter Cline on the new patent lands, and sold them to Hatfield, and upon a supposed assignment of Hatfield's bid a deed was made by the sheriff to Brewer. A year or two later the sheriff of the county executed a deed to Elijah Mounts for the same 400 acre survey based upon the same sale and upon another supposed assignment of Hatfield's bid; and again in 1902 the sheriff of Pike county, acting under the same sale, conveyed the same land to Anderson Hatfield, the original purchaser at the sale. So that as to the new patent lands there were three sheriffs' deeds based upon the same execution sale.

In 1890 Asbury Mounts died claiming title to both the old and new patent lands, and his six children inherited his interest. Prior to 1911 these heirs of Asbury Mounts had sold and conveyed their several interests some two or three times each, with one or two exceptions.

Bishop and Whitt were claiming certain interests under conveyance from certain of the Mounts heirs, and in addition were claiming other interests under some one of the sheriff's deeds made pursuant to the execution sale against Peter Cline; Wolford was claiming certain interests in conflict with those claimed by Bishop and Whitt, while a coal company was claiming the whole mineral right under one of the sheriff's deeds made under the execution sale. At the same time J. H. Charles and Elmira Mounts were claiming under a deed made to them by five of the heirs of Asbury Mounts. The coal company was claiming the whole mineral right in the new patent lands under one of the sheriff's deeds which was claimed to have been made as the result of a forged assignment of the bid at the sale. In fact it seems to have been claimed by some of the parties that the first two deeds made by the sheriff under the execution sale were made to supposed assignees of the original bidder under assignments which were forgeries, and upon the assumption that they were either forgeries or were fraudulent the third sheriff's deed was made many years later to the original purchaser.

In plain language the title to these lands was in a hopeless tangle, and it would have indeed been a courageous lawyer who could have, with any degree of assurance, safely advised any of the claimants as to the state of his title. There were in 1911 several suits pending in the Pike circuit court seeking a settlement and adjustment of these titles, and the appellants and appellee were parties to some of those suits.

In this situation Bishop, acting for himself and Whitt, and Wolford, on the 28th of September, 1911, entered into this contract of settlement as between themselves:

"This agreement, made and entered into by and between Alex Bishop, of the first part, and E. S. Wolford, of the second part, witnesseth, that for and in consideration of the settlement of the lawsuit now pending between these parties in the Pike circuit court, and in settlement of all differences between the parties hereto, it is agreed that tract of land known as the Asbury Mounts tract, on Peter creek and Rockhouse, that said Wolford is to have all the surface of said tract of land; he is also to have four-sixths (2/3) of the minerals and mineral rights and privileges therein; that said Bishop is to have two-sixths (1/3) of the coal, minerals and mineral privileges in, on and under said Asbury Mounts land.

"It is agreed that said Bishop is to have two-thirds of the surface and minerals of the Peter Cline 400 acre tract on the east side of Peter creek and Rockhouse creek; that said Wolford is to have one-third of the surface and minerals on said Peter Cline tract.

"It is agreed that each party is to have one-half of the merchantable timber standing on all the land known as the Cline and Mounts land, which includes all the land now in litigation between these parties and others affecting same lands. Said merchantable timber is such timber as is fifteen inches and up in diameter.

"In consideration of this agreement, each party binds himself to do all they can to perfect the title and to stand together in the litigation that is pending or may be pending between other persons or companies and the parties hereto over the title to

this land, or any part thereof. As soon as the title is cleared, each party binds himself to carry out this agreement and execute deeds to each other for the respective interests as herein set out.''

At that time there was pending in the Pike circuit court an action by five of the Mounts heirs against J. H. Charles and Elmira Mounts to set aside a conveyance made by the five to Charles and Elmira Mounts on January 21, 1902, to their several interests in these lands. When the above contract was entered into between Bishop and Wolford this suit, to which they were not parties but of which they had knowledge, was pending and undetermined.

In 1917 there was pending in the Pike circuit court an action involving the title of the Turkey Gap Coal and Coke Company to the minerals in the new patent lands, and all the parties to this suit were asserting claims therein antagonistic to the claim of the Turkey Gap Coal & Coke Company. In that situation appellants and appellee and the Turkey Gap Coal & Coke Company entered into a written contract whereby they settled their differences as to the mineral rights in the new patent lands, and specified the interest of each in that land; and as a part of the same contract appellants and appellee leased upon certain designated terms their interests in that and other coal lands to the Turkey Gap Coal & Coke Company for the purpose of operating the same and producing coal therefrom. In that lease contract it was agreed that the pending litigation between the parties affecting the title to the minerals in the Peter Cline 400 acre survey should be dismissed settled. In that same lease contract the parties to this suit leased their lands to the Turkey Gap Coal & Coke Company, and designated and set forth their several rights to the royalty therein; and after providing for all of such royalties and their time of payment, it is further provided therein:

''Said lessors (appellants and appellee) agree that lessee may withhold payment of any royalties in order to protect it against any claims made by J. H. Charles or his heirs or assigns to said leased property.''

Then in March, 1920, the case of Mounts, etc. v. Charles was decided in this court, wherein the court de-

clined to set aside the deed of 1902 made to Charles and
Elmira Mounts by J. R. and K. F. Mounts and their
sister, Dolly McCoy, but set aside the same in so far as
Dorsie Mounts and Lucy Wolford were concerned on the
ground they were infants when it was executed. 187 Ky.
421.

Prior to the contract of September, 1911, Wolford
claimed the interests of four of the Mounts heirs by con-
veyance, the interests which he claimed having been con-
veyed prior to the Charles conveyance of September,
1902; but the validity of one or more of those convey-
ances was called in question. At that time Bishop and ·
Whitt claimed the interest of three of the heirs, two of
them being the same as those claimed by Wolford, and
the other being that of K. F. Mounts, who had never
conveyed to Wolford, but had in January, 1902, conveyed
to Charles; and the conveyances under which Bishop and
Whitt claimed were all made subsequent to the Charles
deed. So that when the parties executed the contract of
September, 1911, they had settled their differences as
between themselves to the conflicting interests they each
claimed, but there was left conflicting claims of the coal
company to all the minerals in the new patent lands, and
the conflicting claims of Charles under his deed of 1902.
Assuming that one or the other of the parties to this
litigation had a good title to the two interests in which
they had theretofore claimed conflicting titles, there yet
remained after the settlement with the coal company
the conflicting claim of Charles upon the K. F. Mounts
interest, which was prior in date to the conveyance made
to Bishop for the same interest. When, therefore, the
validity of the deed from K. F. Mounts and two of the
other heirs to Charles was upheld, at least to the extent
of the interest of K. F. Mounts, Charles appeared to have
a paramount title.

In this situation the parties approached Charles in
his lifetime with a view of obtaining his interest, but he
died before the negotiations were completed; but he left
a will in which he authorized his executors to complete
this arrangement, which was done after his death. At
the outset of these negotiations appellee appears to have,
in a measure, cooperated with the other parties to the
contract of 1911, but before the purchase of the Charles
interest was completed and on November 21, 1920, he
notified Bishop by letter: "I have studied our coal
matters over and I have nothing to do with the Kennie

F. Mounts part. I bought it and lost it, and you have bought it and lost it, so I can not make up any losses on that part.''

Notwithstanding this attitude of Wolford, Bishop and Whitt continued their negotiations with Charles' executors, and on the 31st of December, 1920, concluded with them an agreement by which they received a conveyance to all of the interest held by Charles in the two tracts of land, whereby they appear to have perfected the title of the parties as agreed should be done in the contract of 1911. They paid to Charles' executors $6,-000.00 in cash, and they also conveyed to them the surface to a part of the tracts of land dealt with in the contract of 1911, the value of which the pleadings in this action agree was $3,000.00.

Thereafter in 1923 they likewise procured from the heirs at law of Elmira Mounts, one of the vendees in the deed of 1902, a conveyance to her interest taken under the deed, and paid him $2,000.00 therefor.

This is an action by Bishop and Whitt against Wolford seeking to hold him liable under the contract of 1911 for his proportion of the $11,000.00 so paid out by the plaintiff to perfect their title as contemplated by that contract.

Wolford's answer asserts affirmatively that he at the time plaintiffs so paid out this money for the purpose of perfecting the title to their joint property had a better title, and superior title to that which they purchased. He likewise asserts in a separate paragraph, by way of counterclaim, that the property conveyed by the plaintiffs to Charles' executors of the value of $3,000.00 was his property, and the same specifically set apart to him in the contract of 1911.

The issues were all made up, evidence taken, and the chancellor below dismissed the plaintiff's petition, and this appeal results.

It is obvious that Wolford never had title to the K. F. Mounts interest, but his view is that it devolved upon Bishop and Whitt to perfect the title to that interest because they claimed to own it as against Charles, as a basis for entering into the contract of 1911. But the fact appears to be that all the parties at that time knew of the existence of the pending litigation to set aside the Charles deed, and they knew that the Turkey Gap Coal & Coke Company was claiming the whole mineral interest in the Peter Cline survey. With a

knowledge, therefore, of these outstanding claims, and each party with a knowlege of the conflicting claims of the other, they entered into that contract by which they merged their interests and definitely fixed what thereafter should be their interests as between themselves, and as a part of that contract, after merging their interests and fixing the proportion of each as between themselves, they solemnly agreed that in consideration thereof "each party binds himself to do all they can to perfect the title; and to stand together in the litigation that is pending or may be pending between other persons or companies and the parties hereto, over the title to this land or any part thereof. As soon as the title is cleared each party binds himself to carry out this agreement and execute deeds to each other for the respective interests as herein set out."

There is no effort here to set aside that contract, there is no claim that it was procured by fraud, or that it was invalid for any other reason. On the contrary, in 1917 the parties to that contract in furtherance of its purposes settled their differences with the Turkey Gap Coal & Coke Company, and in addition during the same year they acquired title from Hatfield under the last sheriff's deed made under the sale of 1871. Up to the time the Charles deed was declared valid as to three of the Mounts heirs, the parties to the contract of 1911 appear to have acted in harmony with the view of carrying out their purpose to cooperate with each other in perfecting their title to this valuable tract of mineral lands. But after it became apparent that at least Charles and Elmira Mounts, under the deed of 1902, had a superior claim to a part of these lands, representing chiefly the interest of K. F. Mounts, and the specific portion thereof conveyed in that instrument to Elmira Mounts, Wolford appears to have renounced his obligations under the contract of 1911, and to assume that Bishop on his own account should bear the expense of acquiring title to those interests.

It matters not for the purposes of contribution which of the parties to that contract at the time asserted title to the particular portion which it afterwards became necessary to acquire, for by that contract the parties merged their interests, and not only definitely fixed what should be the interest of each, but in addition solemnly agreed to stand together and each to make every effort to per-

fect the title.    These things of course were not to be done in the interest of any particular party to that contract, but in the interest of all, and for the purpose of acquiring outstanding claims to the end that they might enjoy their proportions thereof as fixed in the contract when the title should be perfected.

Clearly the contract of 1911 on its face contemplates the existence of outstanding claims, and obviously those two outstanding claims were the claims of the coal company and of Charles.   Equally clear is it that in the contract of 1917, wherein the parties settled their differences with the coal company and fixed their several royalties to be realized by them in its operation, they all recognized the existence of the Charles claim, for that contract, as we have seen, specifically provides that the coal company may withhold payment of any royalties in order to protect itself against the claim made by Charles or his heirs.

Equitable contribution between co-owners of undivided interests in real estate has often been recognized and enforced, even without a contract between the parties to that effect.  If one such joint owner at his own expense discharges a lien upon the joint property, or is compelled in order to protect his own interest therein to pay out his own money to acquire an outstanding title for the common benefit, he may enforce contribution in equity from the other joint owners in proportion to their interests.   Venable v. Beauchamp, 3 Dana 328; Sneed's Heirs v. Atherton, 6 Dana 276; Hiller v. Nelson, 118 S. W. 292; Pomeroy Equity Jurisprudence, section 1222; 6 R. C. L., page 1049; 38 Cyc. 46.

If, therefore, joint owners of land are in equity liable to each other in contribution because of the payment by one for the benefit of all in acquiring an outstanding title, then certainly where such joint owners enter into a contract in recognition of the fact that there are outstanding and.. probably paramount conflicting titles, and each agrees to do all he can to perfect the title and acquire. outstanding claims, certainly it was within their comtemplation that when one of them in good faith acquired such claim at his own expense the other should contribute to him according to his interest. Between the two they claimed the whole property, and when they entered into this agreement they merged their interests, and thereafter each had an interest in the whole without regard to what had theretofore been their conflicting claims.

We cannot, therefore, escape the conclusion that appellee was liable to appellants to contribute his proportion of the money necessary to acquire these two interests.

But appellants in part payment for the Charles title conveyed to his executors the surface of a tract of land which they allege, and which the defendant in his answer agrees, was worth $3,000.00. The land, the surface to which was so conveyed was a part of the surface which, under the contract of 1911, the parties agreed that Wolford should have, and therefore to the extent that Wolford's land paid Charles, Wolford is entitled to credit therefor, and, as the pleadings agree that the value was $3,000.00, any judgment which is entered against Wolford should credit him by that amount.

In the contract of 1911 the interests of the parties are fixed in both the mineral and surface rights, and are fixed in different proportions in the different tracts of land. Then in the lease contract of 1917 the royalty rights of the parties are fixed in different proportions in the several tracts of land.

In this state of case we will not undertake to make a calculation to show what the liability of Wolford is, but the lower court will enter a judgment fixing the amount to be paid by Wolford under the terms of the two instruments mentioned, and credit whatever that sum is by the $3,000.00.

The judgment is reversed, with directions to enter a judgment as indicated.